**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TEXARKANA DIVISION**

| | | |
|---|---|---|
| HOSPICE OF EAST TEXAS, | § | |
| *Plaintiff*, | § | |
| | § | |
| v. | § | |
| | § | CIVIL ACTION NO. _____ |
| XAVIER BACERRA, in his official | § | |
| capacity as secretary of the United States | § | |
| Department of Health & Human Services, | § | |
| *Defendant*. | § | |
| | § | |

## COMPLAINT FOR JUDICIAL REVIEW OF ADMINISTRATIVE DECISION

Hospice of East Texas ("HOET" or the "Hospice"), by and through its undersigned counsel, files this Complaint against Defendant Xavier Becerra in his official capacity as the Secretary of the United States Department of Health and Human Services (the "Secretary"), seeking judicial review of the decision rendered by the Administrative Law Judge ("ALJ") of the Office of Medicare Hearings and Appeals ("OMHA") in OMHA case number 3-10578408097 and in relation to Medicare Appeals Council ("Council") docket number M-23-4286.

### I. PARTIES

1.      HOET is a Texas non-profit corporation with its principal place of business located at 4111 University Boulevard, Tyler, Texas 75701.

2.      At all times relevant hereto, HOET was a Medicare-certified company offering hospice services in Texas.

3.      Defendant, Xavier Becerra, is the Secretary of the United States Department of Health and Human Services and the proper defendant in this action pursuant to 42 C.F.R. § 405.1136(d)(1).

## II. JURISDICTION AND VENUE

4.      This action arises under Title XVIII of the Social Security Act, 42 U.S.C. § 1395 *et seq.* ("Medicare Act"), and the Administrative Procedure Act, 5 U.S.C. § 551 et seq. (the "APA").

5.      The ALJ's decision is the final administrative decision and is appealable to this Court under 42 U.S.C. § 1395ff(d)(3)(B), 42 C.F.R. § 405.1132, and 42 C.F.R. § 405.1136.

6.      HOET has exhausted all administrative appeals and, therefore, has no administrative remedy available to it and this Court is the proper forum to hear this Complaint.

7.      This action has been commenced following the Council's failure to issue a decision on HOET's appeal of the ALJ's decision within the time frame set forth in 42 U.S.C. § 1395ff(d)(2).

8.      Jurisdiction is proper pursuant to 42 U.S.C. § 1395ff(d), which authorizes judicial review of the ALJ's decision.

9.      Venue is proper pursuant to 42 U.S.C. § 1395ff(b) and 42 C.F.R. §405.1136(b)(1), as HOET's principal place of business is located in this judicial district.

10.      The amount in controversy exceeds the threshold amount of $1,850.00 for judicial review set forth in 87 Federal Register 59437 (effective Jan. 1, 2023).

## III. STATUTORY AND REGULATORY BACKGROUND

### A. The Medicare Hospice Benefit Overview.

11.      The Medicare Hospice Benefit is a benefit under Medicare Part A, a 100% federally subsidized health insurance program. It is administered by the Centers for Medicare and Medicaid Services ("CMS") on behalf of the Department of Health and Human Services ("HHS"). The

Medicare Hospice Benefit pays a predetermined fee, based on the type of care provided by the hospice provider, for each day an eligible patient receives hospice care.

12.    In the Medicare Hospice Benefit, Medicare covers reasonable and necessary hospice services provided to eligible beneficiaries. Services available under the Medicare Hospice Benefit include (a) nursing care and services by or under the supervision of a registered nurse, (b) medical social services provided by a qualified social worker under the direction of a physician, (c) physician services, (d) counseling services, including bereavement, dietary, and spiritual counseling, (e) short-term inpatient care, (f) medical supplies, including drugs and biologicals, (g) home health aide / homemaker services, and (h) physical, respiratory, occupational, and speech therapy services. 42 C.F.R. § 418.202.

13.    To receive the Medicare Hospice Benefit, an eligible patient must file an election statement acknowledging that the patient "has been given a full understanding of the palliative rather than curative nature of hospice care, as it relates to the individual's terminal illness." 42 C.F.R. § 418.24. Palliative care is "patient and family-centered care that optimizes quality of life by anticipating, preventing, and treating suffering" and "involves addressing physical, intellectual, emotional, social, and spiritual needs and ... facilitat[ing] patient autonomy, access to information, and choice." 42 C.F.R. § 418.3. The election must also acknowledge that "certain Medicare services" are waived by the election, namely "Medicare services that are related to the treatment of the terminal condition for which hospice care was elected or a related condition," except for services provided by the designated hospice or the individual's attending physician. 42 C.F.R. § 418.24; *see also* 42 U.S.C. § 1395y(a) (1)(c) ("[N]o payment may be made ... for any expenses incurred for items or services ... in the case of hospice care, which are not reasonable and necessary

for the palliation or management of terminal illness."). A patient is free to revoke the election of the Medicare hospice benefit at any time and for any reason. 42 C.F.R. § 418.28.

14.    The government conditions reimbursement to providers of hospice services on a certification of hospice eligibility. 42 U.S.C. § 1395f. The Medicare Hospice Benefit is organized around benefit periods, *i.e.*, two 90-day benefit periods followed by an unlimited number of 60-day benefit periods. 42 U.S.C. § 1395d(a)(4). The hospice provider is to obtain the written certification "at the beginning of [each benefit] period," and "must obtain the written certification before it submits a claim for payment." 42 U.S.C. § 1395f(a)(7)(A); 42 C.F.R. § 418.22. For the initial 90-day benefit period, a hospice provider must obtain a written certification that the patient is "terminally ill" from (1) the hospice medical director or a physician in the hospice interdisciplinary group ("IDG"), and (2) the individual's attending physician (if any). For subsequent benefit periods, the certification of terminal illness may be from either the hospice medical director or a physician in the hospice IDG. 42 U.S.C. § 1395f(a)(7)(A)(ii).

15.    A patient is terminally ill when the attending physician, medical director, and/or hospice physician (as applicable) exercises their clinical judgment to conclude that "the individual has a medical prognosis that his or her life expectancy is 6 months or less if the illness runs its normal course." 42 U.S.C. § 1395x(dd)(3)(A); 42 C.F.R. § 418.3. A "life expectancy" of 6 months or less means that, in the clinical judgement of the attending physician, medical director, and/or hospice physician (as applicable), the patient's clinical status at the time of certification is more likely than not (*i.e.*, a probability of > 50%) to result in death within six months based on the normal course of the beneficiary's illness. 42 C.F.R. § 418.3.

16.    Several changes have been made to the benefit over the years to ensure certifying physicians are closely involved in evaluating patients in order to determine eligibility. *See, e.g.*,

75 Fed. Reg. 43236 (July 23, 2010). For example, the physician certification must now include a narrative description of the patient, and the certifying physician must "confirm that he/she composed the narrative based on his/her review of the patient's medical record or, if applicable, his/her examination of the patient." 42 C.F.R. § 418.22(b)(3)(iii). Additionally, the physician certifications for the third and later benefit periods must be preceded by the "face-to-face encounter" between the hospice patient and a hospice physician or hospice nurse practitioner, in which such a clinician visits with a hospice patient to gather clinical findings to determine continued eligibility for hospice care and the certifying physician must include an explanation in the certification physician narrative as to why those clinical findings support a life expectancy of 6 months or less. 42 C.F.R. § 418.22(a)(4) and (b)(3)(v).

17.     When physicians evaluate a patient's eligibility for hospice, they look at *prognosis*, not diagnosis. "[E]ligibility for hospice services under the [Medicare Hospice Benefit] has always been based on the prognosis of the individual, not [the] diagnosis ...." 78 Fed. Reg. 48234, 48245 (Aug. 7, 2013). The prognosis takes into account the diagnoses and all other things that relate to a patient's life expectancy. 78 Fed. Reg. 48234, 48245–46. Thus, the hospice physician "must consider the primary terminal condition, related diagnoses, current subjective and objective medical findings, current medication and treatment orders, and information about unrelated conditions when considering the initial certification of the terminal illness." 73 Fed. Reg. 32088, 32138 (June 5, 2008); *see also* 42 C.F.R. § 418.25(b) ("In reaching a decision to certify that the patient is terminally ill, the hospice medical director must consider at least the following information: (1) Diagnosis of the terminal condition of the patient; (2) Other health conditions, whether related or unrelated to the terminal condition; (3) Current clinically relevant information supporting all diagnoses.").

18.    While a prognosis of a life expectancy of six months or less is a necessary condition for reimbursement, Congress and regulators recognize that "[p]redicting life expectancy is not an exact science." *See* 142 Cong. Rec. S9582 (daily ed. Aug. 2, 1996) (statement of Sen. Breaux); *see also* 75 Fed. Reg. 70372, 70488 (Nov. 17, 2010).

19.    The phrase "if the illness runs its normal course" in the definition of "terminal illness" is an important recognition by CMS that a physician's determination of patient prognosis cannot, nor need not, be a certainty. *See* 55 Fed. Reg. 50831, 50832 (Dec. 11, 1990) (citing Government Accounting Office, *Program Provisions and Payments Discourage Hospice Participation* (Sept. 29, 1989)).

20.    CMS has also recognized that there will be variability in lengths of stay because "individuals vary in their responses to illness and care" and further noting that it is not "feasible or prudent to specify or predetermine what lengths of stay should or must be achieved to measure or evaluate the effectiveness of care provided". *See* 72 Fed. Reg. 50214, 50222 (Aug. 31, 2007). Therefore, "[t]he fact that a beneficiary lives longer than expected in itself is not cause to terminate benefits." Medicare Benefit Policy Manual, CMS Pub. No. 100-02, Ch. 9, § 10.

21.    Accordingly, the Medicare framework does not preclude reimbursement for periods of hospice care that extend beyond six months. There used to be a 210-day statutory limit on hospice care, but Congress removed that limitation in recognition of the uncertainty of prognosis. *See* 42 U.S.C. § 1395d(d)(1) (establishing that hospice providers may collect reimbursement for an unlimited number of recertification periods). In a Program Memorandum to Intermediaries/Carriers, CMS has stated:

> Recognizing that prognoses can be uncertain and may change, Medicare's benefit is not limited in terms of time. Hospice care is available as long as the patient's prognosis meets the law's six-month test. This test is a general one. As the governing statute says: "The certification of terminal illness of an individual who

elects hospice shall be based on the physician's or medical director's clinical judgment regarding the normal course of the individual's illness." CMS recognizes that making medical prognostication of life expectancy is not always an exact science. ***Thus, physicians need not be concerned. There is no risk to a physician about certifying an individual for hospice care that he or she believes to be terminally ill***.

Program Memorandum Intermediaries/Carriers, Subject: Provider Education Article, CMS-Pub. 60AB (Mar. 28, 2003) (quoting 42 U.S.C. § 1395f(a)(7)) (emphasis supplied). CMS also has made this point clear in its guidance manuals, stating that "[t]he fact that a beneficiary lives longer than expected in itself is not cause to terminate benefits." Medicare Benefit Policy Manual, CMS Pub. No. 100-02, Ch. 9, § 10.

22.    CMS has not created clinical benchmarks that must be satisfied to certify a patient as terminally ill. In 2008, CMS announced a rule specifying what a hospice medical director "must consider" in making an initial certification. 42 C.F.R. § 418.102(b) ("The physician must consider the following when making this determination: (1) The primary terminal condition; (2) Related diagnosis(es), if any; (3) Current subjective and objective medical findings; (4) Current medication and treatment orders; and (5) Information about the medical management of any of the patient's conditions unrelated to the terminal illness."). CMS initially proposed a rule labeling considerations as "criteria," but removed that word, explaining:

In the proposed rule, we called [areas to consider] "criteria," and we believe that this term may have been the source of commenter concern. Our intent was to ensure that medical directors carefully examine all relevant information that is gathered about the patient before making this determination…. ***We have removed the term "criteria" in order to remove any implication that there are specific CMS clinical benchmarks in this rule that must be met in order to certify terminal illness.***

73 Fed. Reg. 32088, 32138 (June 5, 2008) (emphasis added).

23.    CMS has recognized that seemingly straightforward clinical courses in a patient's condition, such as a decline or stabilization, are much more nuanced in relation to determining

terminality, such that neither a lack of decline nor stabilization necessarily negate a terminal prognosis:

> [B]eneficiaries in the terminal stage of their illness that originally qualify for the [Medicare Hospice Benefit] but stabilize or improve while receiving hospice care, yet have a reasonable expectation of continued decline for a life expectancy of less than 6 months, remain eligible for hospice care. The [hospice medical director] must assess and evaluate the full clinical picture of the Medicare hospice beneficiary to make the determination whether the beneficiary still has a medical prognosis of 6 months or less, regardless of whether the beneficiary has stabilized or improved.

*See* 79 Fed. Reg. 50452, 50471 (Aug. 22, 2014) (emphasis added); *see also* 75 Fed. Reg. 70372, 70448 (Nov. 17, 2010) ("A patient's condition may temporarily improve with hospice care."); 74 Fed. Reg. 39384, 39399 (Aug. 6, 2009) ("We also acknowledge that at recertification, not all patients may show measurable decline."); Palmetto GBA, Hospice Coalition Questions and Answers (Sept. 23, 2008) ("[t]here is no requirement that 'significant documented decline' must be included" to substantiate that a patient has a terminal prognosis of six months or less). Based on CMS guidance, a federal district court has excluded proposed expert testimony that a patient must show decline to remain eligible for hospice. *See Vista Hospice Care,* No. 3:07-CV-00604-M, 2016 WL 3449833, at *15 (N.D. Tex. June 20, 2016) (citing 79 Fed. Reg. 50452, 50471 (Aug. 22, 2014)). Moreover, CMS has acknowledged that it can be difficult to distinguish a sustainable stabilization in a patient's condition from the *impression* of stabilization that could not be maintained if the patient were to be discharged from hospice. *See* 70 Fed. Reg. 70532, 70540 (Nov. 22, 2005); *see also* 79 Fed. Reg. 50452, 50471 (Aug. 22, 2014).

24.    CMS contracts with Medicare Administrative Contractors ("MACs"), which are private companies that process and pay Medicare claims on behalf of CMS. MACs issue Local Coverage Determinations ("LCDs"), which are "administrative and educational tools to assist providers in submitting correct claims," and they also give "guidance to the public and medical

community." *See* CMS Transmittal 608, Medicare Program Integrity Manual, Ch. 13.1.3 (August 14, 2015), available at https://www.cms.gov/Regulations-and-Guidance/Guidance/Transmittals/downloads/R608PI.pdf.

25.     LCDs are eligibility *guidelines*, and do not impose a set of mandatory clinical data-points that must be documented in the medical record to demonstrate a patient's hospice eligibility. Each LCD covers only a specific geographical area, and LCDs specify different clinical guidelines for assessing patient terminality depending on the overall condition of the patient, a particular diagnosis of the patient, or the patient's comorbidities. In short, the appropriate application of an LCD to a particular patient's circumstances is a complex clinical analysis requiring appropriate medical knowledge, skill, experience, and expertise.

26.     LCDs do not and *cannot* establish or change the substantive legal standard for hospice eligibility because LCDs have not gone through the notice-and-comment process outlined at 42 U.S.C. § 1395hh. *See Agendia, Inc. v. Becerra*, 4 F.4th 896, 900 (9th Cir. 2021). Accordingly, a patient's eligibility for hospice cannot be limited by the LCD guidelines if they otherwise satisfy the only valid and substantive legal standard in these cases: a determination by a physician of a prognosis of six months or less if the patient's illness runs its normal course. 42 U.S.C. § 1395x(dd)(3)(A); 42 C.F.R. § 418.3. Thus, meeting the LCD guidelines is just "*one path* to eligibility under the [Medicare Hospice Benefit], but hospices may 'otherwise demonstrate…that the patient has a terminal prognosis.'" *Vista Hospice Care*, 2016 WL 3449833, at *4 (third alteration in original) (citation omitted). In other words, LCDs represent only one of an indefinite number of ways hospice physicians may support their conclusion that a patient has a terminal prognosis under the statutory and regulatory standard.

27.    Because LCDs do not establish substantive legal standards, ALJs are "not bound by LCDs," but must give "substantial deference to [LCDs] if they are applicable to a particular case." 42 C.F.R. § 405.1062(a). If LCDs were a rigid, all-or-nothing checklist for eligibility (*i.e.*, if they were to be afforded complete deference, rather than just substantial deference), they would (a) need to go through the § 1395hh notice-and-comment process and (b) interfere with physicians' exercise of clinical judgment. CMS was clear in the promulgation of the final rule passing the "substantial deference" regulatory standard that the standard "does not alter the ALJ's role as an independent fact finder," and that the regulation should not "lead to adjudicators 'rubber stamping' the previous appeal decision." *See* 74 Fed. Reg. 65296. LCDs themselves do not conclusively establish what is "reasonable and necessary" but, rather, are intended to serve as a "useful framework" to aid in physician decision-making regarding eligibility and facilitate ALJs' analysis of the individual facts presented to determine whether services provided were "reasonable and necessary." *See* 70 Fed. Reg. 11419 (March 8, 2005); 42 U.S.C. 1395y(a)(1)(A).[1]

28.    This principle is particularly true in the hospice context, as hospice LCDs are flexible, intentionally allow for clinical leeway, and lack the more defined thresholds and exhaustive lists of factors present in non-hospice LCDs. For example, the CGS Administrators, LLC ("CGS") LCD for external infusion pumps for administration of insulin states that certain services "*will* be denied as not reasonable and necessary" if specific criteria are not met. *See* CGS Administrators, LLC's LCD for External Infusion Pumps (L33794), available at https://www.cms.gov/medicare-coverage-database/view/lcd.aspx?LCDId=33794&ContrID=140 (emphasis added). Those criteria include objective measurements, such as a "C-peptide level…less

---

[1] "Reasonable and necessary" is the ultimate standard ALJs are bound by under the Social Security Act for Medicare reimbursement. For hospice specifically, the standard for reimbursement is "reasonable and necessary for the palliation or management of terminal illness." 42 U.S.C. 1395y(a)(1)(C).

than or equal to 110 percent of the lower limit of normal of the laboratory's measurement method" and a positive "Beta cell autoantibody test." *Id*. By contrast, the Palmetto LCDs relating to hospice services are permissive and flexible in the ways described above. Moreover, hospice LCDs specifically account for the fact that a physician's determination of patient prognosis cannot, nor need not, be a certainty. *See* 55 Fed. Reg. 50831, 50832 (Dec. 11, 1990); *see also* GAO, *Program Provisions and Payments Discourage Hospice Participation* (Sept. 29, 1989).

29.     Based on CMS commentary, if a patient meets an LCD, then the ALJ must afford substantial deference to the LCD's determination that the patient is eligible for hospice. *See* 82 Fed. Reg. 4974, 5026 (stating that claims may be "denied in error as a result of [a reviewer's] non-compliance with…authority that is owed substantial deference, such as LCDs…."). However, if a patient does not meet an LCD, it does not necessarily follow that the patient is ineligible for hospice. The "substantial deference" standard requires ALJs to utilize LCDs as a basis to *allow* for reimbursement when the guidelines are met but *does not* allow ALJs to deny reimbursement solely because a patient does not squarely fall within the LCDs. If, after undertaking an analysis as an independent factfinder, the ALJ determines that a patient does not satisfy LCD guidelines, the ALJ must consider all other relevant factors bearing on prognosis, including those beyond the confines of the LCD, in order to render a decision.

30.     Given the nuances and complexities of evaluating patients for terminality, as described above, Congress and CMS have entrusted physicians with the responsibility to determine whether a patient meets the definition of "terminally ill." 42 U.S.C. § 1395f(a)(7); 70 Fed. Reg. at 70539 ("It is the physician's responsibility to assess the patient's medical condition and determine if the patient can be certified as terminally ill.")

31.     In cases where CMS or its contractors determine that an item or service is not reasonable and necessary, Section 1879 of the Social Security Act (the "Act"), codified at 42 U.S.C. § 1395pp, provides that payment shall nevertheless be made for such items or services if the provider did not know, and could not reasonably have been expected to know, that such items or services would not be covered. This liability limitation provision specifically applies to cases where CMS or its contractors determine that a Medicare hospice beneficiary was not terminally ill. 42 U.S.C. § 1395pp(g)(2).

32.     If CMS determines a provider has been overpaid, Section 1870 of the Act, codified at 42 U.S.C. § 1395gg, allows for waiver of recoupment of the overpayment where the provider is deemed to be "without fault" with respect to creating the overpayment. A provider is "without fault" as to the creation of an overpayment, and thus entitled to waiver of recoupment of the overpayment, where it had a reasonable basis for assuming that the payments received were correct.

**B. The Medicare Claims Submission, Payment, Auditing, and Appeal Process.**

33.     The Medicare program is administered by the Secretary through CMS which, in turn, contracts with private entities to perform certain functions on its behalf. These functions include, but are not limited to, claims processing for reimbursement submitted by Medicare providers and audits of such claims to ensure that they meet the requirements set forth in the Medicare statute and its implementing regulations.

34.     Medicare claims are processed by MACs. Other CMS contractors such as Zone Program Integrity Contractors ("ZPICs") and Uniform Program Integrity Contractors ("UPICs"), which succeeded and replaced the ZPICs, were and are authorized by CMS to audit claims for payment presented to Medicare by health care providers relating to services they provided to

Medicare beneficiaries. These audits were and are performed on a post-payment basis to ensure that the claims complied with Medicare coverage and documentation requirements at the time they were submitted for reimbursement.

35.     If a Medicare contractor such as a ZPIC or UPIC audited and denied a claim, the affected provider may avail itself of an administrative appeals process to contest the claim denial(s). This appeals process consists of five stages: (i) redetermination, (ii) reconsideration, (iii) a hearing before an ALJ, (iv) review by the Council, and (v) judicial review by a Federal District Court.

36.     Requests for redetermination are processed by MACs. Requests for reconsideration are handled by separate contractors known as Qualified Independent Contractors ("QICs"). Hearing requests are adjudicated by ALJs in OMHA. Requests for Council review are processed by the Council, which is a component of the Departmental Appeals Board of the United States Department of Health and Human Services.

## VI. FACTUAL AND PROCEDURAL BACKGROUND

37.     HOET has served its community as a provider of hospice services since 1982. Since the inception of the Medicare Hospice Benefit the following year, HOET has continuously served Medicare hospice beneficiaries. Presently, HOET now serves more than 2,000 patients and families each year in 23 separate East Texas counties.

38.     Qlarant Integrity Solutions, LLC ("Qlarant"), a UPIC, requested records from HOET pertaining to 242 claims for ten (10) patients billed to Part A of the Medicare hospice program. The claims related to services provided by HOET to its hospice patients between August 1, 2014, and June 30, 2017. The records Qlarant requested included, but were not limited to, hospice beneficiary election statements, the initial and all subsequent certifications of terminal

illness, referring physician documents, registered nurse initial patient assessments, social worker initial assessments, chaplain initial assessments, patient care plans, all visit notes (relating to visits by physicians, nurses, social workers, chaplains, other counselors (e.g., nutritionists), certified nursing assistants, volunteers, etc.), interdisciplinary meeting notes, and face-to-face encounter documentation. HOET promptly complied with this request and provided thousands of pages of responsive records to Qlarant.

39.     In a letter dated February 23, 2021, Qlarant informed HOET that Qlarant denied all 242 claims under review. HOET then received a total of nine demand letters from its MAC, Palmetto GBA ("Palmetto"), beginning on March 24, 2021, asserting that the Hospice must refund to Medicare a total of approximately $959,659.96. Beginning in May 2022, Palmetto recouped from HOET's anticipated Medicare revenue the full amount of the alleged overpayment, *i.e.,* $959,659.96.

40.     HOET initiated an appeal of Qlarant's findings and Palmetto's demand letters through the Medicare administrative appeal process. On July 20, 2021, HOET filed a request for redetermination with Palmetto, seeking review of all 242 denied claims. In its redetermination decision, Palmetto upheld the denial of coverage for the claims at issue.

41.     On November 1, 2021, HOET appealed Palmetto's unfavorable redetermination decision by filing a request for reconsideration with the CMS Qualified Independent Contractor ("QIC"), C2C Innovative Solutions, Inc. ("C2C"), seeking review of all 242 denied claims.  In its reconsideration decision, C2C upheld the denial of coverage for the claims at issue.

42.     On February 3, 2022, HOET filed a request for a hearing before an ALJ, seeking review of all 242 denied claims.  In advance of the ALJ hearing, HOET submitted a position statement to ALJ Kelly McNeil Legier. HOET also sent a copy of the position statement to C2C.

The position statement summarized certain relevant legal and medical authorities that supported the propriety of the claims at issue.

43.     The position statement also introduced HOET's physician expert witness, and Hospice Medical Director, Laura Ferguson, MD, to the ALJ and attached Dr. Furgeon's curriculum vitae as well. Dr. Ferguson received her medical degree from the University of Texas Medical School and is board certified in hospice and palliative medicine. She currently resides in Tyler, Texas where she has successfully practiced for over 15 years while maintaining hospital privileges at two hospitals in the surrounding areas.

44.     In preparation for the ALJ hearing, Dr. Ferguson applied her specialized skill and knowledge as a hospice physician to analyze all of the medical records HOET previously submitted to Qlarant and the other CMS contractors. Based on this analysis, Dr. Ferguson arrived at expert opinions concerning whether the medical records supported the conclusions of the certifying physicians that each patient at issue had a "terminal illness" in relation to the dates of service under review.

45.     The hearing took place before ALJ Kelly McNeil Legier over three days: October 18, October 19, and November 8, 2022.

46.     At the hearing, Dr. Ferguson testified as an expert witness on behalf of HOET and was the only expert witness and physician to testify. No party other than HOET appeared at the hearing and no testimony was provided at the hearing other than that of Dr. Ferguson.

47.     At the hearing, Dr. Ferguson testified that – based on her review of the medical records and after applying her knowledge, skills, and experience as a hospice physician – the medical records supported the certifications of terminal illness and that the patients at issue had life expectancies of six months or less if their illnesses ran their normal course during the months

under review. Dr. Ferguson further testified that the decisions made by Qlarant, Palmetto, and C2C with respect to those months under review were not supported by the relevant medical records and failed to properly apply fundamental clinical and legal hospice principles. Dr. Ferguson's expert physician testimony on these points was unrefuted at the hearing.

48.    Despite the unrefuted expert physician testimony supporting the propriety of the claims at issue at the hearing, ALJ Legier issued an unfavorable Decision on March 28, 2023 (the "Decision"). In doing so, ALJ Legier committed a number of errors that warrant reversal:

- **The Decision is not supported by substantial evidence and is contrary to the overwhelming weight of the evidence.** The administrative record contains evidence of (1) the certifications of terminal illness signed by the hospice physicians who actually treated these beneficiaries and attested in writing to their eligibility, (2) the underlying medical records supporting those certifications, and (3) the undisputed testimony of Dr. Ferguson that, based on her analysis, the medical records support the clinical determinations of the certifying physicians that the beneficiaries had expected prognoses of six months or less if their illnesses ran the normal course. This unrefuted evidence proved and established HOET's burden to show, by a preponderance of the evidence, that the beneficiaries at issue were terminally ill and eligible for hospice services.

- **The ALJ failed to apply the correct legal standards governing clinical eligibility for hospice services, thereby rendering a Decision that is contrary to law.** The ALJ inexplicably held, *inter alia*, the relevant HOET patients needed to demonstrate certain specific symptoms and conditions to become eligible for benefits. However, the symptoms ALJ Legier cited are completely untethered to the LCDs requirements when determining eligibility. *See* Decision pp. 7-41. Moreover, the ALJ contended because some patients' conditions were not declining, this rendered them ineligible for hospice services. Notably, nothing within the applicable statutes, regulations, CMS Ruling, Palmetto LCDs, or other authority requires a decline in condition during each month of service, or even each benefit period, for a beneficiary to remain eligible for hospice services. Further, the ALJ conflated the standard for hospice eligibility with the standards for general inpatient care or continuous home care. This conflation is puzzling as neither general inpatient care, nor continuous home care, are relevant in this case. These conflations and misappropriation of the applicable legal standard are scattered throughout the ALJ's ruling. For example, ALJ Legier determined patients who receive "custodial care" are ineligible for hospice benefits. Although the law prohibits payment for custodial care provided to non-hospice Part A beneficiaries, the Social Security Act § 1862(a)(9) includes an explicit exception in the care of hospice: "[N]o payment may be made under part A...for any expenses incurred for items or services...where such expenses are for custodial care (except, in the case of hospice care, as is otherwise permitted[).]" This demonstrates Congress' recognition of hospice

beneficiaries' need for custodial care and the important benefits hospice care provides beneficiaries in addition to what they would receive from custodial care alone.

▪ **The Decision did not address alleged technical deficiencies in the documentation raised by the underlying reviewer as a basis for denial.** Certain claims for six of the beneficiaries were denied at a lower level of appeal, in whole or in part, based upon alleged technical issues in the medical record documentation. Specifically, the QIC, C2C, questioned the sufficiency of the physician narratives provided in the initial certifications of terminal illness. In addition to addressing these bases for denial at the hearings, the Hospice provided detailed responses to C2C's claims in the Position Statement it submitted to the ALJ in advance of the hearings. *See* Hearing Audio, File 100. However, it is unclear whether the ALJ upheld, overturned, or even considered the technical bases for denial. The ALJ's lack of comment regarding the sufficiency of the physician narratives suggests that the only remaining basis for denial of the beneficiaries' claims is an alleged lack of clinical eligibility for hospice services. Moreover, to the extent that any alleged technical issues with the physician narratives remain a basis for denial, the physician narrative itself is not required to prove a patient's eligibility as a standalone document. The physician narrative is intended to note clinical findings that support terminality and is accompanied by "clinical information and other documentation that supports the medical prognosis." Because the physician narratives at issue provided sufficient narrative explanations for these beneficiaries' hospice eligibility and identified specific clinical findings supporting terminality, they are valid.

▪ **The ALJ failed to limit or waive the Hospice's liability as required under Sections 1879 and 1870 of the Social Security Act.** Section 1879 of the Social Security Act provides that a beneficiary will be shielded from liability if the beneficiary had no reason to know that the services administered were not covered by Medicare. Additionally, Section 1870 of the Social Security Act holds a hospice is without fault when it has a reasonable basis for assuming that payment was correct. Despite this, the ALJ concluded that HOET was not entitled to limitation on liability under Section 1879 of the Act because HOET "is considered to have acquired knowledge that such services would be excluded from Medicare coverage by its receipt of manuals, bulletins, and written guidelines from CMS." *See* Decision p. 41. The ALJ's ruling was merely conclusory as she failed to explain how receipt of the aforementioned materials equates to knowledge that these particular beneficiaries were not terminally ill—a determination that involves the clinical judgment of a physician rather than the application of any regulations or guidance. Further, the ALJ failed to waive any liability otherwise attributable to the Hospice under section 1870 of the Act and did not even undertake an analysis of the 1870(b) waiver. (emphasis added). Instead, she simply concluded the Hospice "knew or reasonably should have known, that the services at issue would be not covered by Medicare such that the [Hospice] is not without fault in causing the overpayments." *See* Decision p. 41-42.

49.    On May 26, 2023, HOET submitted to the Council a Request for Review of Administrative Law Judge Medicare Decision seeking review of the Decision. In this submission,

attached hereto as Exhibit A and incorporated herein by reference, HOET provided additional details and examples concerning the errors made by the ALJ in the Decision.

50.     The Council did not issue a final decision or dismissal order or remand the case to the ALJ within 90 calendar days of receipt of HOET's Request for Review. *See* 42 C.F.R. § 405.1100(c). Accordingly, on September 8, 2023, HOET properly requested that the appeal be escalated to federal district court as permitted by 42 C.F.R. § 405.1132(a). The Council failed to timely respond to HOET's request for escalation. Therefore, this action is timely filed.

51.     HOET has thus exhausted its administrative remedies, and this case is eligible for judicial review.

## COUNT 1 - Violation of the Medicare Act & the Administrative Procedure Act

### THE ALJ APPLIED THE INCORRECT LEGAL STANDARDS

52.     HOET hereby incorporates by reference paragraphs 1 through 51 herein.

53.     The failure to apply the correct legal standard or to provide the court with a sufficient basis to determine that appropriate legal principles have been followed is grounds for reversal.

54.     The ALJ applied incorrect legal standards when she committed the errors described in paragraphs 48-49 and Exhibit A.

55.     As a result of this failure to apply the correct legal standards, the Decision should be reversed.

## COUNT 2 – Violation of the Medicare Act and the Administrative Procedure Act

### THE ALJ'S DECISION IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE.

56.     HOET hereby incorporates by reference paragraphs 1 through 51 herein

57.    The ALJ's Decision must be supported by "substantial evidence" and where reliance is placed on one portion of the record in disregard of over-balancing evidence to the contrary, the court may reverse the Decision.

58.    The ALJ's unfavorable determinations in the Decision were not supported by substantial evidence. Specifically, the decision is contrary to the overwhelming weight of the evidence, the medical records, and the unrefuted expert witness testimony provided by Dr. Ferguson, which together show by a preponderance of the evidence that the beneficiaries had terminal prognoses of six months or less if their illnesses ran the normal course.

59.    Without a rational basis, the ALJ disregarded the uncontested opinion of the only physician expert to testify at the hearing and improperly made medical conclusions she is unqualified and unauthorized to make regarding the beneficiaries' prognoses, which lacked support of any admissible medical opinion evidence.

60.    The ALJ failed to give appropriate weight and deference to the certifying hospice physicians' clinical judgment (*e.g.*, refused to properly consider physician certifications of terminal illness and certain other medical record documentation unless there was corroborating documentary support), despite acknowledgment by Congress and CMS that a hospice physician's role is central to the Medicare hospice benefit.

61.    As a result of the absence of substantial evidence supporting the Decision, the Decision should be reversed.

### COUNT 3 – Violation of the Social Security Act

#### THE ALJ FAILED TO PROPERLY APPLY THE LIMITATION OF LIABILITY AND WAIVER PROVISIONS OF SECTIONS 1879(G)(2) AND 1870 OF THE SOCIAL SECURITY ACT

62.    HOET hereby incorporates by reference paragraphs 1 through 51 herein.

63.     Sections 1879(g)(2) and 1870 of the Act limit and waive, respectively, the Hospice's liability for any alleged overpayments.

64.     Section 1879 provides financial relief to beneficiaries, providers, practitioners, and other suppliers who acted in good faith in accepting or providing services found to be not reasonable and necessary for the diagnosis or treatment of illness or injury or to improve the functioning of a malformed body member, or to constitute custodial care.

65.     The ALJ Decision fails to properly interpret and apply the limitation of liability provisions of Section 1879(a) and (g)(2) in that the ALJ concluded that the Hospice knew or should have known that the services it provided to the patients at issue in the audit would not be covered by Medicare (*i.e.*, that the patients were not terminally ill) simply because the government published the "Medicare laws" and the non-dispositive "guidance" of CMS's contractors.

66.     Therefore, the ALJ's decision should be reversed and this court should rule that the Hospice is entitled to the limitation of liability for the full value of the claims at issue in this matter.

67.     Under Section 1870 if a provider is without fault because it exercised reasonable care in billing for, and accepting, the payment—in other words, it had a reasonable basis for assuming that the payment was correct.

68.     Similarly, the ALJ's Decision does not explain how the Hospice was unreasonable in assuming that the services were reasonable, and the payments correct. Specifically, the ALJ neglected to explain how such notice equates to knowledge that these specific Patients were not terminally ill—a determination that requires the clinical judgment of a physician, rather than the application of any CMS rule or guidance.

69.     As a matter of law and fact, the Hospice is "without fault," and its liability must be waived as to all denied claims.

## VII. PRAYER FOR RELIEF

**WHEREFORE**, HOET respectfully requests that this Court:

1.      Find the ALJ's Decision applied the wrong legal standards;

2.      Find the ALJ's Decision was not supported by substantial evidence;

3.      Reverse the decision of the ALJ that the remaining denied claims did not meet Medicare coverage guidelines for hospice services;

4.      Reverse the decision of the ALJ that payment for the denied services cannot be made in accordance with section 1879 of the Act;

5.      Reverse the decision of the ALJ that recoupment of the alleged overpayment cannot be waived in accordance with section 1870 of Act;

6.      Hold that the Hospice is entitled to reimbursement for the claims submitted relating to Medicare that form the basis of this Complaint;

7.      Order reimbursement to HOET in the amount of $959,659.96 dollars, plus applicable interest; and

8.      Grant to HOET any other legal or equitable relief that the Court may deem just and proper.

Date:  November 22, 2023

Respectfully submitted,

By: */s/ Jennifer Parker Ainsworth*
Jennifer P. Ainsworth
Wilson, Robertson & VanDeventer, P.C.
909 ESE Loop 323, Suite 400
Tyler, Texas 75701
(903) 509-5000 Main
(903) 509-5001 Direct
(903) 509-5092 Fax
email: jainsworth@wilsonlawfirm.com

Tessa F. Carberry
Colorado State Bar No. 54066
Husch Blackwell, LLP
1801 Wewatta Street, Suite 1000
Denver, Colorado 80202
Telephone: (303) 749-7200
Fax: (303) 749-7272
Tessa.Carberry@huschblackwell.com

Bryan Nowicki
Wisconsin State Bar No. 1029857
Husch Blackwell, LLP
33 East Main Street, Suite 300
Madison, WI 53703 3095
Telephone: (608) 234-6012
Fax: (608) 258-7138
Bryan.Nowicki@huschblackwell.com

Emily Solum
Missouri State Bar No. 65089
Husch Blackwell, LLP
235 East High Street,
P.O. Box 1251
Jefferson City, MO 65101-1251
Direct: (573) 761-1120
Fax: (573)-634-7854
Emily.Solum@huschblackwell.com

***Attorneys for Hospice of East Texas***